Present—RICHARD F. LYON, } Judges.
CHARLES J. JENKINS, }

* Chief Justice Lumpkin was prevented by providential cause from attending this term.

---

JESSE M. THORNTON, plaintiff in error, vs. ANDREW J. TOWNS, defendant in error.

The discretion of a Judge in granting or refusing an injunction will not be interfered with, unless abused.

In Equity. Application for Injunction. Decided by Judge RICHARD H. CLARK. At chambers, January 1865.

The plaintiff in error had an estate for the life of his wife in eleven negroes, and in one-half of a certain plantation. He hired the negroes, and leased the plantation to the defendant for the whole period of the wife's life, at the price of $2,000 per annum, commencing with the year 1864, for which year the stipulated price was paid in advance. The contract being reduced to writing, was signed and sealed by both parties. It bore date, Dec. 4th, 1863; and it subjected

the defendant, in terms, to be divested of the right, possession, and use of the whole property, for inhumanity on his part, to the negroes, or for taking any of them out of the county of Dougherty for an unreasonable time, but allowed him the privilege of sub-letting and hiring to any other person.

On this contract, the plaintiff, in January 1865, framed a bill in equity, returnable to Dougherty Superior Court, and presented it to Judge Clark for sanction. The Judge, after giving the defendant an opportunity to answer, heard the matter on the bill and answer, together with the affidavits and other evidence specified below, and refused to order the injunction prayed for. This refusal is the error complained of.

The Bill, after setting out the contract, charges the defendant with divers breaches thereof, by cruelty to the negroes, by sending one of them out of the county, and by permitting waste upon the land; and makes the following specifications: That he forced Chena, one of the women, while she was laboring under an attack of rheumatism, and unable to go—(to do something, the record, as sent up to this Court, does not state what,) to her great damage; that he refused to allow the woman Ellen any time to attend to and suckle her infant child, and would furnish no nurse for it; that on a certain Sunday he forced the woman Julia to hunt hogs, and leave her child for the whole or a large portion of the day, without nursing it; that he was inattentive to the infant children, and suffered them to remain by themselves, and that Julia's child had consequently fallen into the fire and seriously damaged its arm; that he excessively and cruelly whipped the boy Golding, and threatened to hang him with a rope; that he sent the man Peter out of the county for three months, or other space of time, who, while gone, was taken sick, and having returned, was dragged off, before he recovered, and again sent out of the county; that he had allowed one Robson to get oak wood on the land, and one Helms to cut down timber on it for the purpose

of burning ashes, and one Kitchen the right of cutting ash timber on it. These acts and omissions are alleged to be injurious to the plaintiff, and violative of the contract; to work a forfeiture of defendant's right of possession, and to give the plaintiff a right to re-possess himself of the negroes, and to put an end to the contract.

The bill further states, that certain of the negroes having come to the plaintiff's house to spend the Christmas holidays, he has taken possession of them, and still holds them, and that the defendant has sued out a possessory warrant to regain the possession.

The bill prays for discovery; for injunction against the possessory warrant; for re-delivery of the negroes yet remaining in defendant's possession; for rescision and cancellation of the contract; and for general relief.

THE ANSWER denies any violation of the contract, or any inhumanity or cruelty to the negroes. It answers the charge respecting the woman Chena, by stating that Dr. Hardwick, after treating her some four or five weeks, advised that she be put to her business, which was cooking, and that defendant thereupon told her to get up and go to work about the kitchen, and do such work as she could; that she ran away that night, lay out in the woods three or four weeks, and was brought home with her disease aggravated; and that, after lying up again three or four weeks under the treatment of the same physician, she got well, and returned to her work. It states, in reference to the boy Golding, that he was whipped moderately twice, to make him tell the truth as to who had moved him to break into defendant's smoke-house, a deed which the boy confessed he had committed under the coercion of another negro, but prevaricated grossly when required to tell who the other was. After the second whipping, Mr. Mercer, who gave him this whipping, told him in a jesting manner, that he would hang him if he did not tell the truth. There were no marks of the whip left upon him; and in defendant's opinion, the castigation was less severe than it should have been. In reference to

the woman Ellen and her child, the answer states that the child was born about the time the defendant went off in the militia service; that his wife was on the premises, and he has reason to believe that neither the woman nor the child suffered for want of attention, as they both look extremely well, and the child has done well; that since the birth of her child, the woman has done but little work, except to spin and work about the house, and that when she was in the field, there were, besides defendant's wife, an old negro woman and two little negroes, to look after the child. Touching Julia and her child, the answer says that the defendant heard from the bill, for the first time, that the child was burned; that when it left his possession on the 24th of December it was one of the finest looking children in the country; the defendant denies most positively, that it ever suffered with his knowledge or consent; he hired a nurse for it, the one selected by its parents, and after the death of the nurse, its mother had just what time she desired to attend to it; when, and how often she should suckle it was left to her own discretion; there were two little negroes on the place that could have aided her in taking care of it; defendant heard no complaint on the subject; after August, he was unable to be at home but a little of his time, being absent in the militia. In response to the charge of hunting hogs on Sunday, the answer says that the defendant being at home on sick furlough, and having joined, on Saturday, a company of militia which was to leave on the Monday following, he, with Mr. Moremen, went out on Sunday to get up the fattening hogs, as the negroes did not know the particular hogs wanted. They were out from about 9 till about 2 o'clock in the day, but whether the woman Julia was along, defendant does not recollect. Touching Peter, the man sent out of the county, the answer states that an order came to the Sheriff to impress one-fifth of all the able bodied negro men for public work at Anderson, and that on the call of the Sheriff under this order, the defendant let him have one, which was Peter. About that time defendant

Thornton vs. Towns.

went off with the militia, and he consequently knows nothing of Peter's sickness. He has been informed that Peter was absent three months; that in that period he ran away and came home, and was taken and sent back; and he is informed, and believes that he was not sick, either when he came home or when he was sent back.

The answer admits that defendant gave Robson permission to get wood, and that he did get some, but it denies that any damage resulted to the land. It admits, also, that leave was given by defendant to Helms, to get some ashwood to make soap; and to Kitchen, to get some ash-timber to make a cradle.

The answer admits the suing out of a possessory warrant, as charged in the bill.

THE AFFIDAVITS in support of the bill, were of the following import:

*Brady*—Attended to the gathering of the crop, and had control of the hands. There was on the place a woman named Julia, who had a young child; defendant furnished no nurse for it. A portion of the time the weather was excessively cold. The child fell into the fire and burned its arm very badly.

*Mercer*—Defendant asked witness to go down and see after the person that broke into his smoke-house. When they got there, defendant said he had already whipped the boy Golding, who, as witness supposes, was about ten or eleven years old. Peter was sent up to Anderson to work for the Government.

*Herrington*—Defendant said to witness, that after the long nights came, his negroes might cut wood for witness on this land.

*Quick*—At all times of the day, from early in the morning till after dark, on different occasions, negroes representing themselves as belonging to defendant, have crossed over the bridge at Albany, and directed or requested that the toll be charged to him.

*Robson*—Has, by permission of the defendant, cut wood off the land.

*Helms*—Cut wood off the land, by defendant's permission, for making ashes, and there was a great deal of timber cut there in 1864.

*Dickinson*—Is acquainted with the woman Chena. When defendant received her from plaintiff, about the first of January 1864, she was sound and healthy. On the second day after she ran away from the defendant, about the first of April, she was in a very bad condition with rheumatism; she was in bed, unable to turn herself, and so haggard and reduced that witness would not have known her. From these facts, he believes her condition was brought on by bad treatment. He saw her again, — weeks later, when Dr. Jones examined her; she was then somewhat improved. Julia, another of the hired negroes, was confined and delivered of a child, and defendant furnished no nurse for the child, though he compelled its mother to pursue the usual work of a hand. The mother of witness, from sympathy, had it attended to. The general appearance of all the negroes, as contrasted with what they were when defendant got them, indicated hard usage and inhuman treatment. Robson has frequently hauled oak wood off the land; and the hammock, by being cut down and the wood hauled off, has been greatly damaged.

*Dr. Jones*—Examined the woman Chena, at plaintiff's request, some time after the negroes went into the employment of defendant, and found her laboring under inflamatory rheumatism. She had some fever, and the joints, wrists, ankles, and knees, were considerably swollen. Rheumatism is usually brought on by exposure to cold and wet.

The plaintiff also examined a witness, MOREMEN, *ore tenus*, who testified that, of the negroes, three were fellows, two of these between 18 and 50 years of age; that defendant had two other fellows—one his own, and the other hired; that Peter remained at Andersonville three months, including an interval when he was at home professing to be sick; that

witness told him to stay at home, but he was taken back; that the boy Golding was about eight or nine years of age; that defendant told witness he saw the boy crying, and asked him what was the matter, and the boy answered that some negro made him go into the meat-house; that defendant told witness that he whipped the boy; and that the track in the smoke-house corresponded with his. This witness testified, also, that he was familiar with the manner in which defendant treated the negroes, and knew they were well fed and clothed; and that the getting up of the hogs on Sunday, was because defendant had to leave next day for the militia.

The affidavits in support of the answer, were, in substance, as follows:

*Mercer*—Was present when the boy Golding was whipped. Defendant gave him about ten or twelve licks with a small cow-hide, and witness, at defendant's request, added a few more. Witness also threatened to hang him if he did not tell who was with him in robbing the smoke-house. The boy was not at all injured; witness regards the correction as a very moderate one, under the facts of the case. Defendant's smoke-house had been plundered the night before, and from tracks found in the house, corresponding exactly to the size of Golding's foot, and from some other circumstances, suspicion fell upon him. For six or eight weeks, in the absence of defendant, witness superintended his plantation. The woman Julia was allowed to nurse her child, and she informed witness that it was cared for by an old man named Ed., belonging to Mrs. Thornton, hired by defendant to do so. Besides several little negroes, large enough to take care of the child, there was in the house, most of the time, a woman named Phebe, who usually kept the children in her house when the grown hands were out at work. Julia's child showed by its appearance, that it was well attended to by its mother, and that it did not suffer for want of care; it was healthy and likely. From what witness saw while superintending the hired negroes, he says that they were well cared for, and he is certain no acts of cruelty were perpetrated upon them.

*Davis*—Has lived in town for the last year, and knows nothing of the treatment to these negroes; but he previously lived near the defendant, two years, and was often with him upon and about his place, and saw much of his management. Defendant, though a close worker and good disciplinarian, did not over-work his negroes; witness never knew him to treat negroes inhumanly or cruelly. He clothed and fed well, and always gave strict attention to the sick. Witness, both last year and this, (1864–5,) offered to hire six of his own negroes to defendant, so well satisfied was he with his management.

*Jackson*—Examined these negroes, by request, when they were hired; examined seven of them, to-wit: Harry, Ohena, Peter, two women and their children again on the 4th of January 1865. Found them, on the last examination, as well, or better clothed than on the first, and apparently in as good health. One of the children has a burnt place on its arm, which, witness thinks, is not a permanent injury; otherwise, both children look well and healthy.

*Walker*—Was present and examined the negroes when they were hired; they were poorly clad. He examined them again, Janury 3d, 1865, and found them well clad and looking well, their appearance affording no indication of cruel or inhuman treatment. From these facts, he gives it as his opinion that they have been properly cared for.

*Bailey*—Was employed in November 1864, to oversee for defendant, with instructions to work the negroes moderately, and take good care of them; and so he did. They were well fed and kindly treated; their appearance then, showed good treatment. While witness was there, the woman Julia was allowed to nurse her child as often as it needed nursing. She stated that defendant allowed her to go to it four times a day; this, witness thought, more frequent than she ought to go. The child got burnt—witness does not know how; the burn was not very serious, and witness did not inform defendant of it. After this, witness had the child properly cared for. Defendant was very sick at the time, and visited

Thornton vs. Towns.

the place only once while witness was there, and he stayed then but a few moments.

*Moremen*—During the year 1864, he very often noticed these negroes; a part of the time he overlooked them. He feels certain no cruelty was exercised towards them. They were clothed well, and had full rations of good food; and they all now show good treatment. The woman Julia was not debarred the privilege of nursing her child. In her absence, as witness was. informed by the negroes on the place, it was cared for by an old man of Mrs. Thornton's. From its healthy appearance, when witness last saw it, about the first of December, it must have been well cared for. On one occasion defendant did employ Julia in hunting up hogs on Sunday; but witness does not remember, and he doubts, whether she was *required* to go. The fattening hogs were in the swamp, and from thence were getting into a field, destroying corn not gathered. Witness, with all his own hands, and defendant, with his, (but none of the negroes in dispute, except Julia,) went out, and were engaged about five hours in changing the hogs so as to save the corn. This is the only instance of any Sunday work.

*Dr. Hardwick*—Was called by the defendant to the woman Chena, early in the spring of 1864; found her almost helpless from rheumatism. After attending her four or five weeks, he told defendant to put her to light work, as she would improve faster by being out and stirring about than confined ₁in a house. He heard defendant then tell her to get up and do such work as she could. In a few days after this, as witness heard, she ran away, and was gone some three or four weeks. When she came in, she was worse than when she left. Witness then treated her two or three weeks, and she got well and able to work; and, so far as witness knows, she has been well ever since. Witness did defendant's practice during the year; was always sent for promptly to see the sick negroes, several times when it was unnecessary, and was always told by defendant to give them what attention they required; was often at defendant's

place and saw the negroes, and from their appearance, he gives it as his opinion, that they were as well treated as any in the country—well fed, and not over-worked; and he knows that they were well clothed.  ·

*Helms*—During the fall a fire broke out and threatened to destroy the plantation.  Witness, taking his hands and hurrying to the place, succeeded in arresting the fire.    Soon afterwards defendant said to him that, as he had done him a great favor, he would allow witness to get ashes on the place.   Witness burned a few ash-heaps, and took the ashes home.   Witness saw the negroes frequently during the year, and in defendant's absence, superintended the place as one of the policemen.   He observed nothing amiss in the treat- · ment of the negroes, and they showed that they had been properly provided for.

*Robson*—After he obtained permission from defendant to cut and haul hard wood from the leased premises, he applied to plaintiff for his permission, also, and it was granted. The quantity of wood taken, was not more than a two-horse wagon load per week, from about March 1864; and it was for witnesses' family consumption.

STROZIER & SMITH, for plaintiff in error.

VASON, DAVIS & Co., for defendant.

LYON, J.

This was an application for Injunction.

The defendant had sued out, against the complainant, a possessory warrant for the recovery of some negroes that the complainant had hired to him for a term which had not then expired, and who were in the possession of the complainant. And this bill was filed to injoin that proceeding, alleging that the defendant had so violated the terms of hiring, as thereby to annul and cancel it.  By the terms of the contract of hiring of the negroes, and lease of the land, between

the parties, the defendant was to be divested of the right, possession, and use of the whole property, for inhumanity to the negroes, or for taking any of them out of the county. The bill alleged that he had been cruel and inhuman to the negroes, and that he had sent one of them out of the county. General inhumanity and cruelty, as well as specific acts to particular negroes, were charged.

The defendant, being notified of the application, and called upon to show cause why the application should not be allowed, answered the bill, denying all the allegations of inhumanity and cruelty to the negroes, and all breach of the contract by him, wherein he could be divested of the rights acquired thereby. A number of affidavits, of different persons, were submitted by the complainant to support the allegations in the bill, and a number by the defendant, in support of his answer.

Upon the hearing and consideration thereof by the presiding Judge, the injunction was refused, and to this decision the complainant excepted, and that refusal is the only question before us.

The granting or refusal of an injunction, is a question for the discretion of the Judge to whom the same is presented. It is true that this discretion may be controlled by this Court, but it will not be, unless it has been abused. It is true, also, this Court will more readily interfere with this discretion where the injunction has been refused, than where it has been allowed. In this case, we not only see no reason for interfering, but most cordially concur with the Court below in its refusal. The answer denied the allegations of the bill most thoroughly and completely, and the affidavits in support of the answer, in their particularity and fullness, more than counterbalanced the force and effect of the affidavits offered by the complainant.

The bill contained a charge for trespass, or waste, in cutting and carrying away timber and wood from the land leased; and this charge appears to be supported by the accompanying affidavits, as well as by the admission of the answer.

No injunction, however, was prayed against this waste, and if there had been, we do not see how it could have been allowed in favor of this complainant, as his interest does not appear to be affected thereby. The interest of complainant was that of tenant for the life of his wife, and that interest he had parted with to this defendant by this contract.